UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRAVELERS INDEMNITY COMPANY OF
CONNECTICUT, as subrogee of
PERFORMANCE ASSEMBLY,

                Plaintiff,          Civil Case No. 2:07-CV-14096

vs.

                                  PAUL D. BORMAN
CENTRAL TRANSPORT, INC.,        UNITED STATES DISTRICT JUDGE

                Defendant.
_____/

## OPINION AND ORDER: (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now before the Court is Plaintiff Travelers Indemnity Company of Connecticut's ("Plaintiff's") June 26, 2008 Motion for Summary Judgment (Dkt. No. 10) and Defendant Central Transport, Inc.'s ("Defendant's") August 1, 2008 Motion for Summary Judgment.[1] (Dkt. No. 15). A hearing on this issue was held on September 26, 2008. Having considered the entire record, and

---

[1] Defendant responded to Plaintiff's Motion for Summary Judgment on July 23, 2008, but in its response, it included a counter-Motion for Summary Judgment. (Dkt. No. 13). This document was stricken, and the Court instructed Defendant to file both a response to Plaintiff's Motion for Summary Judgment and a Motion for Summary Judgment. (Dkt. No. 14). Without filing a response to Plaintiff's motion, Defendant filed its motion. Defendant never did re-file a response. As a result, Defendant is in violation of Local Rule 7.1(b).
      According to the Sixth Circuit, "the non-moving party bears a burden once the movant has pointed a record evidence showing that there are no genuine issues of material fact. . . . This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden – for example, by remaining silent – its opportunity is waived and its case wagered." *Guarino v. Jones*, 980 F.3d 399, 405 (6th Cir. 1992).
      Since Defendant did originally file a response and has subsequently filed its own motion to dismiss, the Court holds that Defendant has not "wagered" its case and does in fact controvert the facts as set forth by Plaintiff.

1

for the reasons that follow, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

**I.     BACKGROUND**

This case involves a shipment of automobile parts that was allegedly damaged during transport. Plaintiff is an insurance company with its principal place of business in Hartford, Connecticut, (Compl. ¶ 1) and the subrogee of Performance Assembly Solutions ("Performance Assembly"). (*Id*. ¶ 5). Defendant is a Michigan corporation in the business of the transportation of items, with its principal place of business located in Warren, Michigan. (*Id*. ¶¶ 2, 3).

On July 13, 2005, Performance Assembly placed an order with Defendant to have Defendant transport forty-seven superchargers from the Eaton Corporation ("Eaton") premises in Athens, Georgia to Performance Assembly's premises in Livonia, Michigan. (*Id*. ¶ 5). Plaintiff alleges that when the superchargers were picked up by Defendant, Defendant issued a bill of lading to Plaintiff (Compl. Ex. A). Plaintiff also contends that the superchargers were properly packed and in good condition. (*Id*. ¶ 6).

On July 15, 2005, Defendant delivered the cargo to Performance Assembly in Livonia, Michigan. (*Id*. ¶ 5). Plaintiff avers that when the superchargers were delivered, they had been damaged en route and were in need of repair. (*Id*. ¶ 5).

Shortly after the superchargers were delivered to Performance Assembly, Jessica McKinney—quality engineer for Performance Assembly—sent an e-mail entitled "GT shipping debacle" to Peter Lomas, program manager for Performance Assembly, and two Eaton employees, which stated:

> Needed to share with you some photographs of the GTSC shipment received a few minutes ago via [Defendant].

2

> Two of the boxes fell from the skids; one of these opened and was received upside-down with the parts exposed.
> So far I can detect no cosmetic defects but this was from cursory inspection performed on the dock. My concern is the compressor screws. I know that we take great care to baby these parts because of the sensitivity of the internal mechanism.

(Def.'s Br. Ex. 4, 07/15/05 Email). Attached to the e-mail were three photographs. The first photograph shows two corrogated boxes on a pallet on what appears to be Plaintiff's dock floor. (*Id.*). The second photograph shows an upside-down corrogated box situated on the dock floor next to a pallet with the bottom and side of the box opened and three smaller boxes pouring out. (*Id.*). The third photograph shows a close-up version of the box in the second photograph. (*Id.*).

Later that day, Peter Lomas of Performance Assembly sent an e-mail that states in most pertinent part:

> We went through all three boxes and turned up one paint damaged unit. But the damage doesn't come from the mis-handling, it was on a unit in the third layer on the inside spot of the intact box. . . .
> We can't believe that there were no dings, dents or any telltale signs of handling damage! We inspected each machine surface, the pulley surface finish, paint finish and turned each screw to see if we felt any binding. Strange as it seems, it appears to be no handling damage . . . the SC Gods must be smiling on us today!
> One thing is that there was only one container with the "Do Not Stack" sign on it . . . don't know if the freight company removed the others, but have Athens shipping put labels on all 4 sides and the top from now on. And we think that it would help mitigate future shipping damage if the pallets were banded to the pallet using the nylon type banding . . . since the boxes are not stapled together to the pallet, having them banding together (box and pallet) helps the box stay together when the gorilla tips them over in the truck.

(Def.'s Br. Ex. 5, 07/15/05 Email). Still later that day, Preeti Olluwalia—purchasing and logistics manager for Performance Assembly—sent an e-mail to several Eaton and Performance Assembly employees, which states in relevant part: "Please use Roadway [Express] for all inbound shipments to [Performance Assembly] from now on." (*Id.*).

On July 18, 2005, Peter Lomas sent an e-mail to an Eaton employee, stating that "only 16

3

[supercharger] units are subject to unforseen damage" and that "[t]he other two pallets were still intact in their original dunnage contains, [and] those units are considered normal." (Def.'s Br. Ex. 6, 07/15/05 Email). That same day, Eaton acknowledged that the suspect quantity was revised to sixteen units. (*Id.*) Also that same day, an Eaton employee sent a letter to Peter Lomas stating that "[a] quantity of 16 Ford GT Supercharger Assemblies . . . were damaged in transit to Performance Assembly . . . [, that] Eaton will not warranty these parts, and . . . that there is not an assembly level analysis that can be done to qualify the extent of the damage."(Def.'s Br. Ex. 6, 07/18/05 Letter). The next day, however, the same Eaton employee sent the exact same letter to Peter Lomas except the quantity of superchargers was changed from sixteen to forty-seven. (Pl.'s Resp. Ex. D, 07/19/05 Letter).

The following week, on July 25, 2005, Performance Assembly allegedly shipped the forty-seven superchargers to Stockholm, Sweden, which according to the Plaintiff was the only place that they could be repaired. (Compl. ¶ 11). Plaintiff alleges that forty-two of the superchargers were repaired and five were so badly damaged that they could not be repaired. (*Id.*, Ex. B).

On September 25, 2005, Performance Assembly made a cargo loss and damage claim to Defendant for $38,079.80 for the rebuild or replacement of forty-seven superchargers. (*Id.*). Then, on October 4, 2005, a product engineer from Eaton wrote an unaddressed letter suggesting what was the likely cause of the damage to the superchargers and the extent of such damage. (Pl.'s Resp. Ex. D, 10/04/05 Letter). The letter provides in part:

> When a supercharger/screw compressor is dropped, it is highly probable that the internal components will be damaged. Damage to the internal components (i.e. bearings, gears, etc.) can result in increased noise levels during vehicle operation, degradation in vehicle performance, and even catastrophic failure. The probability of one of these failures being present is very high.

4

> There is no non-destructive method available to screen these units for possible defects/damage. The units are unable to be sold to our customer and must be scrapped.

Defendant responded to Performance Assembly's claim on November 4, 2005 denying any carrier liability. (*Id*. Ex. C, 11/04/05 Letter).

On September 28, 2007, Plaintiff filed the present action alleging: strict liability pursuant to 49 U.S.C. § 14706—the so-called "Carmack Amendment."

## II. ANALYSIS

### A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action

5

or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that the non-moving party introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### B. Timeliness of Defendant's Motion for Summary Judgment

Plaintiff argues that Defendant's Motion for Summary Judgment was untimely based on the scheduling order established by the Court on November 29, 2007. According to the scheduling order, dispositive motions were to be filed by June 29, 2008. While Plaintiff's Motion for Summary

6

Judgment—filed on June 26, 2008— was filed before the June 29, 2008 deadline, albeit only by a few days, Defendant's Motion for Summary Judgment was ultimately filed on August 1, 2008—over a month after the deadline.

While Federal Rule of Civil Procedure 56 permits a summary judgment motion to be filed "at any time," this rule is subject to the Court's power to issue a scheduling order under Federal Rule 16(b). FED. R. CIV. P. 16(b)(3)(A) ("The scheduling order must limit the time to . . . file motions."); s*ee also, Kennedy v. Cleveland*, 797 F.2d 297, 301 n.6 (6th Cir. 1986) ("Although Fed. R. Civ. P. 56(b) states that a defendant may move for summary judgment 'at any time,' we do not believe that this precludes the district court from controlling the proceedings before it, at least not to the extent of requiring it to consider disruptive motions on the eve of trial."). The scheduling order "may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). "Good cause" means that the schedule "cannot reasonably be met despite the diligence of the party seeking the extension." FED. R. CIV. P. 16 Advisory Committee Notes, Subdivision (b)(1983 Amendment).

Although some courts have adopted a more rigid reading of Federal Rule of Civil Procedure 16(b), thereby denying motions for summary judgment filed outside of the scheduling order, other courts have taken a more pragmatic approach to reading both Federal Rule 16(b) and 56. *Compare Dedge v. Kendrick*, 849 F.2d 1398 (11th Cir. 1988) (denying a motion for summary judgment filed just over two months after the deadline set in the scheduling order); *Julian v. Equifax Check Servs.*, 178 F.R.D. 10, 16 (D. Conn. 1998) ("The Supreme Court did not intend Federal Rule 16(b)(2) to be ignored when a party filing a summary judgment motion invokes the 'at any time' language of Rule 56. The 'at any time' provision . . . must be interpreted to be subject to the case management dictates of Federal Rule 16(b).") *with Johnson v. United States*, 460 F.3d 616 (5th Cir. 2006)

(holding that "[i]t is uncertain whether the 'case management dictates' of rule 16(b) must necessarily prevail over the 'at any time' dictates of rule 56(b), and not *vice versa*.") (emphasis in the original).

In the instant action, the Court will treat Defendant's Motion for Summary Judgment as timely filed. As indicated above, no clear consensus consists amongst the circuits as to whether the "at any time" language in Federal Rule 56(b) is overridden by Federal Rule 16. At the very least, the Sixth Circuit appears to leave that decision with the district courts. *See Kennedy*, 797 F.2d at 301 n.6. Contrary to Plaintiff's assertion, allowing Defendant to file its motion after having seen Plaintiff's motion does not provide an unfair advantage to Defendant nor is it prejudical to Plaintiff. As illustrated below, Plaintiff's Motion for Summary Judgment did not present any novel arguments or any evidence that was not already part of its Complaint.

### C. Carmack Amendment

This lawsuit arises under the 1906 Carmack Amendment to the Interstate Commerce Act, which imposes liability on carriers for "actual loss or injury" to goods damaged in interstate transport. *See* 49 U.S.C. § 14706(a)(1)(2008). According to the U.S. Supreme Court, the Carmack Amendment has the effect of "codif[ing] the common law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Mo. Pacific R.R. v. Elmore & Stahl*, 377 U.S. 134, 137; 84 S.Ct. 1142, 1144; 12 L.Ed.2d 194 (1964) (citations omitted).

A plaintiff establishes a prima facie case under the Carmack Amendment by showing that (1) the goods were received by the carrier in good condition, (2) the goods arrived at their

destination in a damaged condition, and (3) a specified amount of damages resulted. *See Plough, Inc. v. Mason & Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980) (quoting *Elmore & Stahl*, 377 U.S. at 137). Once the plaintiff has established its prima facie case, the burden shifts to the carrier defendant to prove that (1) it was free from negligence and (2) that the damaged cargo was not a result of one of the five exceptions listed in *Elmore & Stahl*, supra. *Plough, Inc.*, 630 F.2d at 470-71 (citing *Am. Hoist & Derrick Co. v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 414 F.2d 68, 72 (6th Cir. 1969)).

Because Plaintiff has not established its prima facie case under the Carmack Amendment, the Court denies Plaintiff's Motion for Summary Judgment. Similarly, because Defendant has not negated any part of Plaintiff's claim or shown that Plaintiff does not have enough evidence of an essential element of its claim to carry its ultimate burden at trial, the Court denies Defendant's Motion for Summary Judgment.

### 1. The Condition of the Superchargers Upon Delivery to the Defendant

With respect to the first element of its prima facie case, Plaintiff argues that "Defendant accepted the shipment of superchargers from Eaton Corporation, and acknowledged that the shipment was in good condition by authorizing the bill of lading." (Pl.'s Br. 6).

While a bill of lading, on its own, may constitute some evidence that a shipment was received in good order, it is not necessarily prima facie evidence of that condition. *See American Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 929 (7th Cir. 2003). A "statement in the bill of lading as to 'apparent good order' [, however, ] is prima facie evidence . . . that, as to parts which were open to inspection and visible, the goods were in good order at the point of origin." *Hoover Motor Express Co. v. United States*, 262 F.2d 832, 834 (6th Cir. 1959); *see also Security Ins.*

*Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2nd Cir. 2004) ("A shipper's burden of proving that the goods were delivered to the carrier in good condition may be satisfied by the proffer of a clean bill of lading for the shipment, *provided that* the cargo was packaged in a way that permitted its inspection.") (emphasis added).

Without providing any specific analysis on details of the bill of lading, Plaintiff asserts that "[t]he bill of lading reflects [sic] clearly shows receipt of the packages in good condition." At best, the bill of lading shows that the goods were received—but not necessarily in good condition—by Defendant. But even assuming that the Defendant specifically acknowledged on the bill of lading that the superchargers were received in good order, the bill of lading does not constitute prima facie evidence because the Plaintiff has not shown that the goods were open to inspection and visible. In fact, photographs of the cargo provided by the Plaintiff show that the superchargers were each contained within a sealed box and then placed in a larger sealed box with two other similarly sealed superchargers. (*See* Def.'s Br. Ex. 3). Plaintiff does not deny that the containers were sealed in this manner. Instead, in its Response, Plaintiff avers that Defendant has not "come forward with any evidence indicating that it, at any time, requested inspection of the superchargers, or that a request for inspection would have been denied by either Plaintiff, or Eaton Corporation." (Pl.'s Resp. Br. 2). Plaintiff demands too much from Defendant.

Under the Carmack Amendment jurisprudence, a carrier does not have an affirmative duty to inspect goods in a sealed container. In fact, the pursuit of such an objective by the carrier goes against the very ends that the Carmack Amendment seeks to achieve—the safe and reliable interstate transportation of goods. One could easily surmise how goods sealed in containers could become damaged as a result of the carrier's inspection or even after the carrier has re-sealed the goods for

transport.

Instead, when the shipment is sealed, "the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo." *Security Ins.*, 391 F.3d at 84 (citations omitted). Thus, to clarify, "[w]hen the shipment at issue is not a sealed container, then the carrier has the initial burden of informing itself of the condition of the goods received." *A.I.G. Uruaguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003) (internal quotations omitted). But "[w]hen the shipment at issue is a sealed container, [as it appears to be the case here] then the carrier has no independent ability to ascertain the contents of the shipment, and the shipper is held to higher standard of proof." *Id.* at 1004.

As set forth above, it appears that the superchargers were sealed twice—once in a smaller individual box and then again in a larger box with two other sealed boxes each containing other superchargers. (*See* Def.'s Br. Ex. 3). Because the shipments appear to have been sealed, Plaintiff must set forth additional evidence establishing that the shipment was in good condition upon delivery to Defendant. Plaintiff, however, has not brought forth any additional evidence to support its claim. Rather, Plaintiff's claim that the shipment was received by Defendant undamaged rests solely on the bill of lading.

Finally, Plaintiff argues in its Response that in any case "there is no evidence that the damage that occurred was the type that would have happened before the shipment." (Pl.'s Resp. 7). This argument rests on a case from the Eleventh Circuit, which held that "a case may be made by a bill of lading that recites receipt of the sealed packages in good external condition, when coupled with damage 'of a kind which could not in the nature of things have occurred before the shipment.'"

11

*A.I.G. Uruaguay*, 334 F.3d at 1004 (11th Cir. 2003) (quoting *McNeely & Price Co v. The Exchequer*, 100 F. Supp. 343, 344 (E.D. Pa. 1951)). While this holding certainly is sound, it nevertheless raises a fact issue unresolved by the Plaintiff—whether the damage to superchargers was of a kind which could not in the nature of things have occurred before the shipment. The only evidence that Plaintiff offers is a letter from Eaton, which claims that the superchargers were "damaged/dropped during shipment" and that "[w]hen a supercharger/screw compressor is dropped, it is highly probable that the internal components will be damaged." (Pl.'s Resp. Ex. D, 10/04/05, Letter).

Defendant, on the other hand, contends that it did not receive the superchargers in good condition. It postulates that the damage must have been inflicted prior to it being received by Defendant. In support of its contention, Defendant points to an e-mail from Peter Lomas, Project Manager for Performance Assembly, dated July 15, 2005, which states that upon a thorough inspection of the cargo, he discovered paint damage that had nothing to do with any mishandling. (D's Br. Ex. 5, 07/15/05 Email). The paint damage referenced by Peter Lomas, however, was "minor" and Defendant has not set forth any corroborating evidence, supporting its prior damage claim.

Accordingly, the Court finds that genuine issues of material fact exist as to whether the superchargers were in good condition when obtained by the Defendant. Namely, a genuine issue of material fact remains as to whether the damage to the superchargers was of a kind which could not in the nature of things have occurred before the shipment.

### 2. Goods Damaged Prior to Their Final Destination

Plaintiff contends that it does not have the burden of showing damage to the shipment prior

to delivery and that Defendant bears the burden of "strict liability" for loss or injury to a shipper's property. These assertions of law are patently incorrect. Plaintiff has the burden of proving all three elements of its prima facie case. This includes proving by a preponderance of the evidence that the goods were damaged—or lost or completely destroyed—when they arrived at their final destination.

In cases where the courts have found that the plaintiff established its prima facie case, the plaintiff in those cases brought forth sufficient evidence showing that the goods were destroyed during transit. *See, e.g.*, *Yellow Freight*, 325 F.3d at 930. For instance, in *Yellow Freight*, the carrier picked up a shipment of import cigars in Miami and delivered them to Wisconsin. *Id.* at 927. When the driver picked up the cigars, he noted that some of the cardboard boxes were crunched down but nonetheless signed a clean bill of lading. *Id.* When the goods arrived at their final destination, however, the top and bottom boxes in the shipment were wet and many were crushed. *Id.* Shortly after being informed of the damage, both the shipper and the carrier sent adjusters to inspect the damage. *Id.* at 928. Both adjusters found extensive damage. *Id.* In affirming the district court's finding that the plaintiff had established his prima facie case under the Carmark Amendment, the Seventh Circuit noted that there was testimony indicating that when the goods were delivered to their final destination, "water came out of the trailer, the top and bottoms of the cartons were wet, some the cartons on the bottom had disintegrated, and many of the boxes were crushed." *Id.* at 930. Thus, the cigar plaintiff had sufficiently established that the goods were damaged prior to delivery.

Here, Plaintiff has specifically pointed to only one snippet of evidence indicating that the superchargers were damaged prior to the time of delivery and instead, throughout it pleadings, continues to contend that this burden rests with Defendant and that Defendant is strictly liable to Plaintiff. The only evidence that Plaintiff offers is an affidavit from Jeffrey Cackowski, Director

of Quality and Claims for Defendant, which states that Defendant "did not package the Cargo, did not unpackage the Cargo at any time during transport and did not unpackage the Cargo at the time of delivery." (Def.'s Br. Ex. 2, Cackowski Affidavit).

Plaintiff argues that since the affidavit only states that Defendant did not *package* or *unpackage* the cargo, as opposed to stating that Defendant did not *unload* the cargo, Defendant must have unloaded the cargo, thereby damaging the superchargers in the process. While such an inference may be drawn—in contemplating Defendant's Motion for Summary Judgment—it should be given very little weight given that Plaintiff has provided no other evidence indicating that Defendant unloaded the cargo. More importantly, Plaintiff has failed to show by a preponderance of the evidence that the unloading process is what caused the alleged damage to the superchargers. Therefore, even if Plaintiff had sufficiently shown that Defendant unloaded the cargo, Plaintiff has not made the vital evidentiary link of showing that the superchargers were damaged at the time they were unloaded.

Defendant, on the other hand, has brought forth at least some evidence indicating that the damage to the superchargers was caused either prior to Defendant receiving the cargo, as addressed above, or alternatively, after the cargo was delivered. In support of his post-delivery damage argument, Defendant points to a series of photographs taken by Plaintiff. The first photograph shows two corrogated boxes on a pallet on what appears to be Plaintiff's dock floor. (D's Br. Ex. 3). The second photograph shows an upside-down corrogated box situated on the dock floor next to a pallet with the bottom and side of the box opened and three smaller boxes pouring out. (*Id*.). The third photograph appears to show a close-up version of the box in the second photograph. (*Id*.). The photographs were attached to an e-mail dated July 15, 2005, entitled "GT shipping debacle,"

14

and sent to Peter Lomas and two employees of Eaton from a quality engineer for Performance Assembly, Jessica McKinney. (Def.'s Br., Ex. 4). The e-mail stated that Ms. McKinney:

> Needed to share with you some photographs of the GTSC shipment received a few minutes ago via [Defendant].
> Two of the boxes fell from the skids; one of these opened and was received upside-down with the parts exposed.
> So far I can detect no cosmetic defects but this was from cursory inspection performed on the dock. My concern is the compressor screws. I know that we take great care to baby these parts because of the sensitivity of the internal mechanism.

(*Id.*). Defendant also references the e-mail from Peter Lomas, which states: "We went through all three boxes and turned up one paint damaged unit. But the damage doesn't come from the mishandling . . . . We can't believe that there was [sic] no dings, dents or any telltale signs of handling damage!" (Def.'s Br. Ex. 5). As Defendant points out, neither e-mail makes any direct reference to Defendant being responsible for the boxes falling from the skids, nor does either one state that the boxes were discovered in Defendant's truck upside-down. (Def.'s Br. 16).

The e-mails, though, do make a few statements that can easily be construed against Defendant. First, the e-mail from Ms. McKinney states that "[t]wo of the boxes fell from the skids; one of these opened and was *received* upside-down with the parts exposed." (Def.'s Br. Ex. 4) (emphasis added). This seems to indicate that the boxes fell from the skids while Plaintiff was still in the process of receiving the goods from Defendant—or put another way, while Defendant was unloading the goods.

Second, the e-mail from Mr. Lomas says that the paint damage does not "come from the mishandling" and then later states that there does not appear to be "any telltale signs of handling damage." (D's Br. Ex. 4). Upon first glance these statements seem favorable to Defendant, as they tend to show there was no actual damage to the superchargers at the time of delivery. Upon re-

15

examination, however, Mr. Lomas's reference to "the mis-handling" combined with his later general reference to "handling" as it is commonly used—i.e., shipping and handling—tend to suggest that he was referring to Defendant as the cause of the damage. This inference is further supported by the e-mail from Preeti Olluwalia, which tells several employees of Eaton and Performance Assembly to use Roadway—another carrier—for all inbound shipments to Performance Assembly from now on.

Accordingly, the Court concludes that genuine issues of material fact remain as to whether the cargo was damaged before it was delivered to Performance Assembly. Specifically, genuine issues of fact exist as to whether Defendant unloaded the cargo—as opposed to unpackaging the cargo—and as to whether the unloading process was the cause of the alleged damage to the superchargers.

### 3. Actual Damage

Plaintiff first asserts that the Carmack Amendment imposes strict liability on carriers for damaged cargo, which thereby relieved it of any burden to show actual damage. Again, Plaintiff misinterprets the law. Under the Carmack Amendment, parties are able to recover damages for "actual loss or injury to the property." 49 U.S.C. § 14706(a)(1)(2008). Along with the other two elements of its prima facie case, the burden of proving actual damages rests with the Plaintiff. *See Plough*, 630 F.2d at 470.

Then, arguing in the alternative, Plaintiff alleges $38,079.80 in damages for the replacement or repair of the forty-seven superchargers. In support of its allegation, Plaintiff submits the cargo loss and damage claim that Performance Assembly filed with Defendant and a letter from an Eaton employee indicating that Eaton would warrant the claims before the shipment but not afterward.

(Compl. Ex. B, P's Resp. Ex. D, Letter 07/19/05). Attached to the cargo loss and damage claim form is a simple cost break-down summary of the repair and replacement charges of the parts along with the freight charges. (Compl. Ex. B).

Apart from the simple cost break-down summary, Plaintiff has not provided the Court with any other documentation to substantiate the damage claims listed on the cargo loss and damage claim form (e.g., invoices from repair company in Sweden, invoices for replacement parts from Eaton, shipping invoices,[2] etc.), even though it is clearly in the position to do so. Even the July 19 letter from Eaton is not much help, as it merely states that there was damage done to the superchargers and not the amount of the damages incurred. Moreover, Defendant was not given any opportunity to inspect the superchargers before they were sent to Sweden for repair.

In addition, as Defendant correctly points out, a discrepancy exists as to the number of units actually damaged. On July 18, 2005, Peter Lomas—Performance Assembly's Project Manager—sent an e-mail to Eaton indicating that "only 16 units are suspect for unforseen damage." (Def.'s Br. Ex. 7). That same day, an Eaton representative responded to Peter Lomas via e-mail stating that Eaton had revised the quantity to sixteen units. (Def.'s Br. Ex. 8). Also that same day, an Eaton employee sent a letter to Peter Lomas stating that "[a] quantity of 16 . . . superchargers were damaged in transit." (Def.'s Br. Ex. 6). Then, on July 19, 2005, without any explanation of how the number of units changed, that same Eaton employee sent the exact same letter to Peter Lomas stating that "[a] quantity of 47 . . . superchargers were damaged in transit." (Pl.'s Resp. Ex. D). Finally, on September 28, 2005, Performance Assembly submitted a cargo loss and damage claim to Defendant for the rebuild of forty-seven superchargers in the amount of $38,079.80. In

---

[2] Defendant, however, references a shipping invoice from Lysholm Technologies in Stockholm, Sweden for an amount of $2,075.00. (Def.'s Br. Ex. 9).

addition to failing to provide supporting documentation as to actual damages it incurred, Plaintiff fails to provide any evidence that explains the discrepancy.

The Court finds that Plaintiff has failed to show by a preponderance of the evidence that it incurred actual damages in the amount of $38,079.80. Nevertheless, because the correspondence between Eaton and Performance Assembly, when read in the light most favorable to the Plaintiff, suggests that at least some of the superchargers were actually damaged, the Court finds that genuine issues of material fact exist as to the extent of the actual damages incurred by Performance Assembly.

Because genuine issues of material fact exist as to all three elements of Plaintiff's prima facie case under the Carmack Amendment, Plaintiff's summary judgment motion is denied. Likewise, because Defendant failed to conclusively demonstrate that Plaintiff lacks enough evidence to meet any of the three elements of its prima facie case, Defendant's summary judgment motion is also denied.

### III. CONCLUSION

For all these reasons, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

**SO ORDERED.**

                                                  s/Paul D. Borman
                                                  PAUL D. BORMAN
                                                  UNITED STATES DISTRICT JUDGE

Dated: November 3, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 3, 2008.

                                              s/Denise Goodine
                                              Case Manager